WINGATE TAYLOR-MAID TRANSPORTATION, Inc.
*v.* Carrie BAKER and Nico Baker

92-321                                                840 S.W.2d 179

Supreme Court of Arkansas
Opinion delivered November 2, 1992

*Daggett, Van Dover & Donovan*, by: *Jesse B. Daggett*, for appellant.

*Roy C. Lewellen* and *J. L. Wilson* of *Wilson & Associates*, for appellees.

STEELE HAYS, Justice. Wingate Taylor-Maid Transportation, Inc. (defendant below) appeals from a judgment entered pursuant to a jury verdict awarding $40,000 to Carrie Baker and $15,000 to her daughter, Nico Baker. The judgment was for personal injuries to the Bakers arising from a collision with Wingate's tractor-trailer rig. The collision occurred when Wingate's driver, Fred Lynch, struck the Baker vehicle as Carrie

Baker was turning left from State Highway No. 1 onto Highway 242. At the end of the trial the plaintiffs moved for a directed verdict on the issues of negligence and comparative fault and, over Wingate's objection, the trial court directed the jury to return a verdict for the plaintiffs.

On appeal, Wingate argues several points of error, mainly that a verdict for the plaintiffs should not have been directed. We agree and, therefore, reverse and remand for a new trial.

Mrs. Carrie Baker told the jury she was driving south on State Highway No. 1 in Phillips County. Her daughter was a passenger. The highway was straight and level. Mrs. Baker intended to turn left onto State Highway No. 242 and she began slowing down as she neared the intersection. The approach to the intersection from the north is controlled by a no passing zone for southbound traffic as indicated by a solid yellow line inside the center line marker. Mrs. Baker described the collision:

> As you approach the intersection there's a no passing zone and that's where I started slowing down. That's what I did on June 18. There were several cars coming from Helena in the opposite direction. I put on my indicator and starting slowing down so I'd be able to turn. I had reached about half way between the start of that yellow line before you get to the intersection. When I looked through my rear view mirror after checking the traffic again and this tractor trailer was right in back of me. He jumped out in the left lane and didn't cut far enough and hit me. He didn't come out far enough and he hit me once and it looked like we hooked together or something because shortly after that he came right back and hit me again and then it knocked me on through the intersection. It spun me around. I couldn't control my car. I lunged forward and hit the car and the car just started going. The driver of the tractor trailer began to pull to the left lane and he hit me when he was attempting to come back in. He pulled out and tried to get back. He hit the rear axle of my car on the driver side. I was not hit from directly behind. Both hits were from that side. I was hit twice. I was hit just below the intersection.

On cross examination Mrs. Baker testified that she had a rear view mirror on the left side of her vehicle which was properly

adjusted. She had a full view of the roadway behind her and realized the importance of keeping a lookout ahead as well as behind. She first saw the truck a considerable distance behind her and when she looked again the truck was close behind and moving into the left lane. She said she remained in the right lane as the truck moved into the passing lane. As the truck pulled abreast it struck her near her left rear wheel. Mrs. Baker maintained she never started a left turn and never crossed the center line until after the vehicles collided. The two vehicles came to rest near the southeast quadrant of the intersection.

Nico Baker's testimony was corroborative: that her mother saw the truck behind at a pretty good distance and turned on her signal light "to help the truck slow down." She said the truck struck them first and then struck them again. She said they were in the right lane when each impact occurred.

Officer Seigfred Lewis of the Arkansas State Police investigated the accident and obtained photographs. He said the two vehicles were southbound and the truck had apparently pulled out to pass as the car was slowing down to make a left turn "and as it started to make the left turn the impact occurred." He charted skid marks from the truck beginning some distance from the area of impact and extending north in straight lines for 130 feet. The skid marks were located entirely in the left, or passing, lane. There was testimony by the treating physicians that Mrs. Baker stated she was turning to the left when the accident occurred.

At the close of the case the plaintiffs moved for a directed verdict on the question of liability. Because Fred Lynch had not testified, counsel for appellees maintained that plaintiffs' testimony was not rebutted. The trial court granted the motion for a directed verdict, observing that there was no evidence of negligence, or of contributory negligence. Counsel for appellant argued there was circumstantial evidence that Mrs. Baker did not see the truck overtaking her, evoking a response by the trial court that "she testified she did see the truck and no one else has testified otherwise."

In ruling on a motion for directed verdict, the trial court views the evidence most favorably to the non-moving party and gives that evidence its highest probative value, taking into account all reasonable inferences deducible from it. *Dorton* v.

*Francisco*, 309 Ark. 472, 833 S.W.2d 362 (1992). The evidence must be given its highest and strongest probative value, and the motion must be granted if the evidence is so lacking in substance that it would require a jury verdict to be set aside. *Jefferson Hospital Associates, Inc.* v. *Garrett*, 304 Ark. 679, 804 S.W.2d 711 (1991).

There seems to have been a misconception at the trial level that because Fred Lynch did not testify there was no evidence to refute Mrs. Baker's testimony. There are two responses—it has long been the law here and generally that the testimony of a party interested in the result of the action will not be regarded as undisputed in determining the sufficiency of the evidence. *Metcalf* v. *Jelks*, 177 Ark. 1023, 8 S.W.2d 462 (1928). Moreover, the testimony of the officer, his diagram of the scene, photographs of the highway and testimony of the treating physicians concerning Mrs. Baker's description of the accident, provide ample evidence from which the jury could have inferred that Mrs. Baker was, in fact, turning when the collision occurred. That being so, it was also the jury's prerogative to decide whether that was a proximate or contributing cause of the collision. Counsel's admission during trial that Lynch was passing in a no passing zone is simply evidence of negligence (AMI 903). The admission could well have led to a verdict for the plaintiffs, but that was not an admission of liability for purposes of a directed verdict. It was for the jury to determine whether the admitted conduct was a proximate cause of the collision. *Woodmen of the World Life Insurance* v. *Reese*, 206 Ark. 530, 176 S.W.2d 708 (1944).

Appellees insist that because Mrs. Baker was the forward vehicle she had the superior right to the use of the highway for purposes of turning or leaving. AMI 902. We fully agree and the jury was instructed accordingly. Appellees also maintain there was no duty by Mrs. Baker to keep a lookout to the rear before turning. But they cite no authority for that principal and we are aware of none and are unwilling to adopt that proposal as a rule of law. The rules of the road provide that a motorist will keep a proper lookout (AMI 902) and we conclude that under fitting circumstances, here for example, a jury question arises as to whether ordinary care requires a lookout to the rear. We said as much in *Cobb* v. *Atkins*, 239 Ark. 151, 388 S.W.2d 8 (1965):

Proper look out *means more than to look straight ahead, or more than just seeing the object;* that it implies being watchful of the movements of his own vehicle as well as the movements of the things seen; that it involves the care, prudence, watchfulness and attention of an ordinary, careful and prudent person under the circumstances. [Emphasis added.]

In sum, Mrs. Baker testified she saw the truck a considerable distance away, then immediately behind and finally pulling around her while she was still in the right lane. If the jury determined, as the evidence permitted, that she began turning under those circumstances, the jury could also have decided such conduct caused or contributed to the collision. Hence, a directed verdict was not consistent with the evidence.

The remaining points are moot but we will comment briefly on two rulings for purposes of retrial. The officer testified that Fred Lynch was concerned that he might lose his job because of the accident and the presence of a woman passenger in his truck. The trial court overruled appellant's objection based on relevance and permitted that information to go to the jury. The relevancy of evidence rests in large measure with the discretion of the trial court. *Barnett* v. *Arkansas Transport Co., Inc.* 303 Ark. 491, 798 S.W.2d 79 (1990). We cannot anticipate how this evidence will be developed at a later trial and we are not inclined to review prematurely an issue involving discretion. We will observe, however, that without something to connect the presence of the passenger with the collision, it is difficult to see the probative weight of such evidence as exceeding its rather obvious prejudice.

Another point of contention concerns peremptory challenges. The exact composition of the jury panel is not stated but it appears to have been equally divided between black and white venire persons. Appellant used his peremptory strikes to excuse three black jurors and appellees used theirs to excuse three white jurors. Appellees challenged the strikes of appellant under *Batson* v. *Kentucky*, 476 U.S. 79 (1986) and *Edmonson* v. *Leesville Concrete Co., Inc.*, ___ U.S. ___ (Decided June 3, 1991), which prompted appellant to offer an explanation for the strikes. At that point appellant moved that appellees explain their use of

peremptory challenges. Appellees declined and the trial court rejected the challenge. If the use of peremptory challenges on retrial establishes a pattern suggesting that race is the motivation for the strikes, we would be constrained under *Edmonson* to hold that a private civil litigant may raise the equal protection claim of a person whom the opposing party has excluded from jury service on account of race.

Reversed and remanded.

NEWBERN, J., not participating.