KIDDER v MILLER-DAVIS COMPANY

WOLTHUIS v MILLER-DAVIS COMPANY

Docket Nos. 103024, 105498. Argued January 15, 1997 (Calendar Nos. 8-9). Decided July 8, 1997. Rehearings denied 456 Mich 1201.

Donald L. Kidder, an iron worker, was leased to Miller-Davis Company, a general construction contractor, by Construction Labor Services, a labor broker. After suffering injuries while working on a Miller-Davis renovation project, he and his wife, Dawn M. Kidder, brought a negligence action in the Kalamazoo Circuit Court against Miller-Davis. The court, John F. Foley, J., granted summary disposition for the defendant. The Court of Appeals, HOEKSTRA and G. SCHNELZ, JJ. (NEFF, P.J., dissenting), affirmed in an unpublished opinion per curiam, holding both Construction Labor Services and Miller-Davis to be coemployers within the meaning of the Worker's Disability Compensation Act, and that Miller-Davis thus was entitled to enforcement of the act's exclusive remedy provision (Docket No. 166059). The plaintiffs appeal.

David L. Wolthuis also was leased to Miller-Davis Company through Construction Labor Services and was injured while performing demolition work for Miller-Davis. He and his wife, Esther Wolthuis, brought a negligence action in the Kalamazoo Circuit Court against Miller-Davis. The court, William G. Schma, J., granted summary disposition for the defendant, holding that Miller-Davis was a coemployer and immune from liability under the exclusive remedy provision of the WDCA. The Court of Appeals, SAWYER and J. P. JOURDAN, JJ. (NEFF, P.J., dissenting), affirmed in an unpublished opinion per curiam (Docket No. 168754). The plaintiffs appeal.

In an opinion by Chief Justice MALLETT, joined by Justices BRICKLEY, RILEY, and WEAVER, the Supreme Court held:

A labor broker and its customer both are subject to, and protected by, the exclusive remedy provision of the worker's compensation act. A labor broker relationship existed between Construction Labor Services and its customer, Miller-Davis, to an extent that each was a coemployer for purposes of the act and is protected by, and entitled to, the exclusive remedy provision of the act. Further, under the economic-reality test, Miller-Davis was the plaintiffs'

employer for purposes of the exclusive remedy provision and, thus, immune from tort liability.

1. In determining who is an employer for purposes of the exclusive remedy provision of the WDCA, Michigan case law rejected the rigid, common-law control test and adopted the economic reality test, which examines the totality of the circumstances surrounding the employment relationship and the work performed. Control is only one factor to be considered, and no one factor is controlling. A court must examine the work performed, whether it was a part of a common objective integral to the employer's business, and whether it normally would follow the usual path of an employee.

2. In these cases, Construction Labor Services was a labor broker that provided workers pursuant to job description requests furnished by Miller-Davis. It billed Miller-Davis weekly, dollar for dollar for the workers' wages, fringe benefits, payroll taxes, worker's compensation and liability insurance premiums, state corporate tax, trade travel pay, FICA, and, additionally, for the cost of administering the contract and handling of all other employment matters. Constructive Labor Services was a payment conduit for Miller-Davis, which unequivocally assumed the responsibility for these payments. Clearly, the trades construction personnel worked for both Constructive Labor Services and Miller-Davis.

3. Under the economic-reality test, both Construction Labor Services and Miller-Davis must be considered coemployers for purposes of the exclusive remedy provision of the worker's compensation act. The totality of the circumstances surrounding the employment relationship and the work performed reveals that the two were so integrally related that their common objectives were only realized by a combined business effort. Their agreement to the contrary is neither dispositive nor controlling.

*Kidder*, affirmed.

*Wolthuis*, affirmed.

Justice KELLY, joined by Justices CAVANAGH and BOYLE, dissenting, stated that where the terms of a contract are clear and unambiguous, they should be enforced as written. The defendant entered into an agreement that, by its clear and unambiguous terms, denied that the defendant was the plaintiffs' employer, specifically spelling out that Construction Labor Services was the sole employer. Under the circumstances, the defendant should be bound by the terms of its contract. Because it is not plaintiffs' employer, the defendant is liable in tort for any negligence to the plaintiffs.

Coemployer status cannot be found solely because two parties enter into a labor broker relationship. The contract that the defendant and Construction Labor Services signed makes theirs an atypi-

cal labor broker relationship. Its language renders it so clear and unambiguous that defendant is not plaintiffs' employer, that it alone must control. There is no reason to apply the economic realities test. The contract also explicitly sets forth the duties of Miller-Davis and Construction Labor Services. Because Miller-Davis contracted to avoid an employer's responsibilities, it should not be allowed to assert the exclusive remedy provision as an affirmative defense.

*Schenk, Boncher & Prasher* (by *Frederick J. Boncher* and *Curtis D. Rypma*) for plaintiffs Kidder.

*Ford, Kriekard, Domeny & Byrne, P.C.* (by *Thomas H. Rosenhagen* and *David W. McMorrow*), for plaintiffs Wolthuis.

*Straub, Seaman & Allen, P.C.* (by *John M. Donahue*), for the defendant.

MALLETT, C.J. We granted leave in these consolidated labor broker cases to determine whether defendant Miller-Davis is a coemployer of the plaintiffs and thus immune from tort liability under the exclusive remedy provision of the Worker's Disability Compensation Act. In both cases the Court of Appeals affirmed grants of summary disposition in favor of the defendants, holding that the defendant was a customer of Construction Labor Services (CLS), a labor broker, and as such was protected from suit under the exclusive remedy provision of the WDCA. We affirm and hold further that under the economic-reality test defendant was also the plaintiffs' employer for purposes of the exclusive remedy provision of the WDCA.

I

The two cases are almost factually indistinguishable. Both Mr. Kidder and Mr. Wolthuis, plaintiffs in

their respective cases, were injured on construction sites at which the defendant was the general contractor. Both men were employees of CLS. CLS is a labor broker in the business of providing "leased services of construction trades personnel on an independent contractor basis" to construction contractors. Both Mr. Kidder and Mr. Wolthuis were leased construction trades personnel furnished to Miller-Davis by CLS. The lease agreements between CLS and Miller-Davis, covering both employees, are identical.

A

Plaintiff Wolthuis, leased to Miller-Davis through CLS, was performing demolition work on a multimillion dollar construction project in Kalamazoo when he was impaled through the neck by a piece of jagged reinforcement steel protruding from a block of concrete being hoisted by defendant's crane at the work site. He was subsequently burned by an acetylene torch that fell on him after he was impaled. Plaintiff alleged in his complaint that defendant was negligent in failing to provide a safe workplace and negligent in the operation of the crane. Just before trial, the court entertained and granted the defendant's motion for summary disposition, holding that Miller-Davis was a coemployer and immune from liability under the exclusive remedy provision of the WDCA.[1]

---

[1] The statute provides in pertinent part: "The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer . . . ." MCL 418.131(1); MSA 17.237(131)(1). The only exception to the exclusive remedy provision is an intentional tort, which has not been alleged in these cases. *Id.*

In the Court of Appeals, plaintiff argued that Miller-Davis was not a coemployer, that, in the alternative, the court erred in granting the motion because more than a single inference could be drawn from the facts, and that the issue should have been decided by a jury. In addition the plaintiff asserted that Miller-Davis was estopped from asserting that it was an employer by virtue of the express language in the contract. The Court of Appeals rejected these arguments. The majority held that only one conclusion could be drawn from the facts: defendant was a customer of CLS, a labor broker, and as such was entitled to the exclusive remedy of the WDCA. Unpublished opinion per curiam, issued February 23, 1995 (Docket No. 168754), citing *Howard v Dundee Mfg Co*, 196 Mich App 38, 40; 492 NW2d 478 (1992); *Farrell v Dearborn Mfg Co*, 416 Mich 267; 330 NW2d 397 (1982); *Renfroe v Higgins Rack Coating & Mfg Co, Inc*, 17 Mich App 259; 169 NW2d 326 (1969). With regard to the contract between CLS and Miller-Davis, the Court stated, "[w]e also find no merit to plaintiffs' estoppel argument on these facts because courts will look beyond the labels placed on relationships in applying the WDCA." *Id.*, citing *Fitzgerald v Mobil Oil Corp*, 827 F Supp 1301 (ED Mich, 1993).

Judge NEFF dissented, stating that under the terms of the agreement the only inevitable conclusion was that defendant was not plaintiff's employer and was not entitled to the exclusive remedy provision of the WDCA. Judge NEFF distinguished this case from *Farrell* and its progeny on the basis of explicit language of the contract, which she noted was never repudiated by either party. Because the majority's opinion "turns the agreement between defendant and CLS on its head

and effectively nullifies an otherwise valid contractual agreement between the parties," Judge NEFF would have reversed and remanded this case for trial on the liability issue. *Id.*[2]

B

Plaintiff Kidder, an iron worker also leased to Miller-Davis through CLS, was working on the renovation of the Kalamazoo Center when he plummeted ten feet from some roof decking through an open skylight, shattering both his elbows. Plaintiff Kidder filed suit against Miller-Davis for negligently failing to

---

[2] In her dissent, Judge NEFF highlighted the following provisions in the agreement between CLS and Miller-Davis, entitled "Agreement Between Construction Labor Services, Inc. and Miller-Davis Company":

1. CLS provided construction trades personnel on an independent contractor basis.

2. Such leased personnel were not to be employees of Miller-Davis for any reason.

3. CLS was responsible for all employment matters. This included withholding taxes; payment of withheld taxes and employment-related taxes; providing worker's compensation, disability, life and group health insurance; providing a pension plan. In addition CLS was responsible for any contract administration matters respecting any collective bargaining agreements covering the leased employees.

7. CLS had the sole responsibility for recruiting, hiring, training, evaluating, replacing, supervising, disciplining, and discharging construction workers leased to Miller-Davis. CLS also was to designate on-site supervisors to direct operational and administrative matters and directly supervise CLS trades personnel. CLS retained the responsibility to establish procedures under which CLS employees conducted their job performance and times of employment. Further, Miller-Davis could not modify the contract between CLS and its leased personnel, nor could it recruit, hire, train, evaluate, replace, supervise, discipline, or discharge leased individuals. However, CLS agreed to remove any person leased to Miller-Davis that Miller-Davis in its sole discretion deemed unsatisfactory and find a suitable replacement.

8. CLS was to implement its policies and procedures relating to leased personnel.

9. CLS agreed to indemnify and hold harmless Miller-Davis as owner and architect.

place covers on or guardrails around the open sky-
lights, negligently failing to supervise subcontractors,
and negligently failing to provide a safe workplace.
Miller-Davis moved for summary disposition, claiming
that the plaintiff was an employee of both CLS and
Miller-Davis and therefore his only remedy was under
the WDCA. MCL 418.131; MSA 17.237(131). The trial
court agreed in spite of express language in the CLS-
Miller-Davis contract, stating "[s]uch leased personnel
shall be employees of CLS for all purposes. Such
leased personnel shall not be employees of [Miller-
Davis] for any reason."

The Court of Appeals affirmed, relying on *Farrell v
Dearborn Mfg Co, supra,* and held that a labor broker
relationship existed between CLS and Miller-Davis.
The Court stated: "Accordingly, the economic reality
being that both CLS and defendant were employers
within the meaning of the WDCA, defendant was enti-
tled to the enforcement of the WDCA exclusive remedy
provision." Unpublished opinion per curiam, issued
January 12, 1996 (Docket No. 166059). Judge NEFF
again dissented, reiterating her dissent in *Wolthuis.*

II

A

The determination of who is an employer for pur-
poses of the exclusive remedy provision of the WDCA,
as well as other statutory schemes, has had a rich and
voluminous history. Early cases that addressed this
question, first in the arena of unemployment compen-
sation, evaluated the existence of the relationship
under a "control" test.

> The control theory is the traditional common-law test
> used to delineate the master-servant relationship. The the-

ory, in its delineation of the servant concept, has for its pur-
pose the definition and delimitation of the scope of the
master's liability under the doctrine of *respondeat superior.*
Because most compensation acts contain no specific defini-
tion of the term "employee," it was generally taken for
granted that the common-law definition of employee, or ser-
vant, used for purposes of vicarious tort liability was to be
used for purposes of workmen's compensation laws.
[*Nichol v Billot,* 406 Mich 284, 293-294; 279 NW2d 761
(1979).]

This test attempted to separate those persons who
were employees from those who were independent
contractors. This assessment examined who con-
trolled the work, the hours, the process, and the
methods of the work involved. The initial rule was
"where the person employed is in the exercise of an
independent and distinct employment, and not under
the immediate control, direction, or supervision of the
employer, the latter is not responsible for the negli-
gence or misdoings of the former." *Powell v Employ-
ment Security Comm,* 345 Mich 455, 469; 75 NW2d
874 (1956) (SMITH, J., dissenting) (citations omitted).
"The control test is also used to determine when an
independent contractor has become an employee for
purposes of *respondeat superior* liability on the part
of his employer who has exercised a degree of con-
trol inconsistent with independent contractor status."
*Nichol v Billot, supra* at 296 citing *Powell* at 471.

Justice TALBOT SMITH's thoughtful dissent in *Powell,*
which later became the prevailing law, strongly criti-
cized the rigid control test and the absurd, chaotic
decisions that resulted from it. He noted that the con-
trol test failed to achieve any uniformity or certainty
and that this tort concept should be inapplicable to

the administration of social legislation.[3] *Id.* at 471. Justice SMITH noted that accepting this rigid control test could lead to much mischief, in that employers would start hiring independent contractors to do everything to avoid their "statutory obligations under the national labor relations act, under the social security, unemployment compensation, and fair labor standards acts, and, in addition, many of the other Federal and State laws . . . ." *Id.* at 473.

Justice SMITH was influenced by federal case law administering the National Labor Relations Act. In *United States v Silk*, 331 US 704, 713; 67 S Ct 1463; 91 L Ed 1757 (1947), the United States Supreme Court first articulated an economic-reality test for assessing the employer-employee relationship.

> The problem of differentiating between employee and an independent contractor or between an agent and an independent contractor has given difficulty through the years before social legislation multiplied its importance. When the matter arose in the administration of the National Labor Relations Act, we pointed out that the legal standards to fix responsibility for acts of servants, employees or agents had not been reduced to such certainty that it could be said there was "some simple, uniform and easily applicable test." The word "employee," we said, was not there used as a word of art, and its content in its context was a federal problem to be construed "in the light of the mischief to be corrected and the end to be attained." We concluded that, since that end was the elimination of labor disputes and industrial strife, "employees" included workers who were such as a matter of economic reality. The aim of the Act

---

[3] In *Powell*, the majority found that a woman employed as an industrial homeworker retouching photographic negatives was an independent contractor and thus not an employee for purposes of unemployment compensation. Everything about her employment was controlled by the employer except that her work was completed at home. *Id.* at 457, 460.

was to remedy the inequality of bargaining power in contro-
versies over wages, hours and working conditions. We
rejected the test of the "technical concepts pertinent to an
employer's legal responsibility to third persons for acts of
his servants." This is often referred to as power of control,
whether exercised or not, over the manner of performing
service to the industry. [*Id.* (Citations omitted.)]

Persuaded by the reasoning in *Silk*, Justice SMITH
adopted the economic-reality test in his frequently
cited dissent in *Powell*. He determined that a court
must examine the work performed, whether it is part
of a common objective integral to the employer's bus-
iness, and whether this work would normally follow
the usual path of an employee. *Powell* at 479, citing
*Rutherford Food Corp v McComb*, 331 US 722; 67 S Ct
1473; 91 L Ed 1772 (1947). Accordingly, control is
only one factor to be considered.

In *Tata v Muskovitz*, 354 Mich 695; 94 NW2d 71
(1959), this Court overwhelmingly abandoned the
control test in favor of the economic-reality test to
determine who is an employer for purposes of the
Worker's Disability Compensation Act. In *Schulte v
American Box Board Co*, 358 Mich 21; 99 NW2d 367
(1959), Justice SMITH defined more fully the parame-
ters of the economic-reality test:

The earlier cases tested this relationship through applica-
tion of the "control" factor, originally a test for tortious lia-
bility, having its roots in the relationship of the apprentice
to his master in early English industrial society. As applied
to today's complex economy of the assembly line, of dis-
persed industrial operations, of concentrated operations but
with semi-autonomous "departments" or branches, and of
general contractors who, in turn, employ subcontractors
and sub-subcontractors, the "control" test is often meaning-
less, usually ambiguous, and always susceptible of paper-

writing evasions. Consequently we have abandoned it. The test is now one of economic reality. This is not a matter of terminology, oral or written, but of the realities of the work performed. Control is a factor, as is payment of wages, hiring and firing, and the responsibility for the maintenance of discipline, but the test of economic reality views these elements as a whole, assigning primacy to no single one. [*Id.* at 32-33 (SMITH, J., concurring) (citations omitted).]

The economic-reality test was embraced by this Court as a more realistic attempt to define the employer-employee relationship through a "balancing of all the relevant factors in each case," than the rigid control test. *Renfroe, supra* at 265. Given the increasingly complicated relationships developing in today's business and economic marketplaces anything other than a totality of the circumstances test would be an insufficient guide by which to evaluate the employee-employer relationship.

B

A labor broker-customer arrangement presents a unique employment relationship and adds a further dimension to the analysis of who is an employer for purposes of the WDCA. *Renfroe, supra,* was one of the first cases to examine the labor broker relationship within the context of the Worker's Disability Compensation Act. The issue in *Renfroe* was whether the defendant, Higgins Co., a customer of a labor broker, was an employer, for purposes of the exclusive remedy provision of the worker's compensation act, thus precluding separate recovery. *Id.* at 261. The plaintiff in *Renfroe* was employed by Employers Temporary Service (ETS) whose sole business was supplying temporary labor to industrial and commercial customers. Customers would contact ETS on a daily basis, and ETS

would dispatch the required numbers of workers. ETS paid the workers and withheld their taxes. The customer, however, instructed the workers and had the authority to dismiss them.

Higgins Co. frequently used ETS to supply it with temporary help. The plaintiff, supplied by ETS to Higgins, injured his right hand in a punch press and received medical and disability compensation for his injury from ETS's worker's compensation insurer. He then sought additional recovery from Higgins, arguing that a restrictive definition should be used to define "employer" because it was in his best interests to be able to sue Higgins as a third-party tortfeasor. The Court rejected the plaintiff's argument, acknowledging the preference for a more liberal approach to defining the term "employer," which necessarily followed the purposes behind "providing social remedial legislation in an attempt to provide benefits for injured employees under the workmen's compensation act." *Id.* at 263. That approach favors the economic-reality test over the rigid control test.

In evaluating this triangular relationship, the Court of Appeals noted that ETS workers agreed to work for ETS, and then agreed to work for ETS customers. The Court of Appeals reasoned that, regarding labor brokers, the

> economic reality is based on the fact that a profit can be made by efficiently matching workers with temporary work needs. ETS maintained control of the workers by its practice of daily reassignment and daily payment at its offices. It also maintained the formalities of employment by handling all paper work and payments incident to the employment. [*Id.* at 266.]

The Court of Appeals held that under the economic-reality test both ETS and Higgins were the plaintiff's employers, even though each employment situation was different. In holding that the plaintiff could not proceed against Higgins, and that the suit was barred by the exclusive remedy provision of the worker's compensation act, the Court stated: "It is not necessary to make fine semantic distinctions as to types of degrees of control, *et cetera*. It is enough to say that either could be liable under the workmen's compensation act, therefore, both are protected by it." *Id.* at 266-267.

In *Nichol v Billot, supra* at 299, this Court examined the employer-independent contractor relationship and held that the economic-reality test "in its consideration of factors beyond the control element, achieves a more realistic determination" of who is entitled to the exclusive remedy defense under the worker's compensation act. *Id.* In addition, and more importantly, we held that the question of the defendant's status is one of law for the court and not one of fact for the jury when the evidence and facts are susceptible of one inference only. *Id.* at 302, quoting *Flick v Crouch*, 434 P2d 256 (Okla, 1967).[4]

In *Farrell v Dearborn Mfg Co, supra*, this Court had yet another chance to evaluate the application of the exclusive remedy provision of the WDCA in four cases, three of which involved labor brokers.[5] In each

---

[4] In *Nichol*, after applying the economic-reality test, we held that the defendant was an independent contractor as a matter of law, and remanded the case for trial on the issue of negligence. *Id.* at 306.

[5] The fourth case involved an International Hockey League linesman who was attacked by an irritated hockey player. Applying the economic-reality test to the relationship between the linesman, the league, and the team, we held that the hockey team was not the plaintiff's employer; thus,

of these cases, labor brokers State Labor, Inc., Kelly Services, Inc., and Employers Temporary Service furnished employees to others. In each, a worker was injured, received worker's compensation benefits, and brought suit against the customer of the labor broker. We held that "the exclusive remedy available to the employee in a labor broker situation is provided by the worker's compensation statute and that a separate tort action against the customer of the labor broker may not be maintained." *Id.* at 278.

In arriving at this conclusion, we first discussed the purpose and meaning behind the WDCA and its exclusive remedy provision. We noted that a fundamental premise of the act is that if the employee's injury falls within its provisions, then worker's compensation will be the only remedy against the employer and the employer's insurance carrier. In assuming responsibility for work-related injuries, the employer is thus protected from excessive damage awards, and injured employees are automatically compensated for their injuries.[6] *Id.* at 274.

In *Farrell*, the plaintiffs argued that this separate cause of action should not be barred under the exclusive remedy provision because the conditions of liability as stated in the statute did not exist. In rejecting this argument, we examined the roles of the labor

the hockey player was not a fellow employee, and the linesman's suit against the team was not barred.

[6] "[T]ort litigation is an adversary contest to right a wrong between contestants; workers' compensation is a system, not a contest, to supply security to injured workers and distribute the cost to the consumers of the product." 1 Larson, Workmen's Compensation, § 2.70, p 1-16. The notion of fault is eliminated, and the idea is compensation tied to earnings, the costs of which are ultimately passed on to the consumers. *Id.*, §§ 3.00-3.30, pp 1-17 to 1-19.

broker and its customers to assess who should be considered an employer for purposes of the statute. We noted that in each of the cases the labor broker's business was to supply the customer with temporary employees pursuant to the customer's expressed needs. In addition, we noted that, once the employee reported to the customer, the employee was under the control and supervision of the customer's supervisory personnel. The customer could discharge an employee, or refuse to accept an employee. We noted further that the customer does not pay the employee directly. The employee is paid by the labor broker who charges the customer a fee for the services provided. *Id.* at 275.

We also addressed whether an employment relationship existed using the economic-reality test as our guide and adopted the standard enunciated in *Renfroe*. See *supra*. In *Farrell*, we stated that "[t]he economic reality test looks to the employment situation in relation to the statutory scheme of workers' compensation law with the goal of preserving and securing the rights and privileges of all parties. *No one factor is controlling.*" *Id.* at 276 (emphasis added). Embracing the reasoning in *Farrell* we stated:

> The customer received a worker each day who was subject to its authority. By engaging the services of the labor broker, the customer knew that, in exchange for a set fee, the broker would pay the employees, handle all paperwork, and provide compensation coverage. The Court concluded that the economic reality was that both the labor broker and its customer were employers within the meaning of the workers' compensation statutes. We agree with the reasoning and result of this decision.
>
> The labor broker providing personnel for temporary employment is a common business practice. The roles of

the broker and its customer are defined and structured to fulfill short-term needs of many types of industries. When viewed in terms of control, payment of wages, allocation of responsibilities, maintenance of discipline, etc., it is clear that the two are so integrally related that their common objectives are only realized by a combined business effort. The broker supplies as the customers demand.

To conclude that an individual so employed is outside the scope of the exclusive remedy provision would clearly disregard the overall objectives of the statutory scheme. [*Id.* at 277.]

Accordingly, we held that a separate action against the customer could not be maintained.

### III

Turning our focus to the cases at hand, we find that a labor broker relationship existed between CLS and Miller-Davis to such an extent that a dual or coemployer relationship was formed, precluding a separate tort action against the customer of the labor broker.[7] This conclusion is further supported by our analysis of the economic realities of the employment situation which compels us to hold that Miller-Davis was the plaintiffs' employer for purposes of the exclu-

---

[7] We stop short of holding that a labor broker-customer relationship will always establish dual employer status as a matter of law. In this regard, we note that *Farrell* may be seen as ambiguous. We held in *Farrell* that the exclusive remedy provision bars a separate tort action against the employer in a labor broker situation. Yet, additional language in that opinion indicates that the inquiry does not end there because we recognized that the labor broker relationship must still be "viewed in terms of control, payment of wages, allocation of responsibilities, maintenance of discipline, etc. . . ." *Id.* at 277. We realize that this may appear to be inconsistent. However, each case turns on its own facts and, as hinted at in *Farrell* and reemphasized in our decision today, we note that the existence of a labor broker relationship in and of itself may not always be dispositive.

sive remedy provision of the worker's compensation statute.

A

The parties do not dispute that CLS is a labor broker whose business is the provision of construction trades personnel to contractors. The labor broker-customer relationship is very different from an independent contractor-subcontractor relationship. CLS is not a subcontractor. No bids were ever solicited or received, and Miller-Davis did not relinquish its ultimate supervision or control of the work site to CLS or any other subcontractor. CLS provided the workers "pursuant to the job description requests furnished to CLS by [Miller-Davis] from time to time."[8] Further, CLS designated supervisors on the work site also pursuant to job description requests furnished by Miller-Davis.

CLS billed Miller-Davis on a weekly basis for the workers' wages, fringe benefits, payroll taxes, worker's compensation and liability insurance premiums, state corporate tax, trade travel pay, and FICA. CLS also billed Miller-Davis an additional fee that covered the cost both of administering the contract and the handling of all other employment matters. The fact that Miller-Davis did not directly pay the workers is a distinction without a difference. CLS was a payment conduit for Miller-Davis. Miller-Davis reimbursed CLS dollar for dollar, including an amount for worker's disability compensation. Miller-Davis unequivocally assumed the responsibility for these payments. This alone is evidence that Miller-Davis

---

[8] The fact that the contract was for twelve months, renewable yearly, does not change the fact that CLS was a labor broker providing temporary workers.

was not giving up completely its role as employer. Clearly, the trades construction personnel worked for both CLS and Miller-Davis. Miller-Davis paid a premium for this particular service. There is no question, under both our reasoning in *Farrell* and the Court of Appeals opinion in *Renfroe* that this was a coemployer situation. Accordingly, we reaffirm our decision in *Farrell* and hold that under these circumstances a labor broker and its customer both are subject to, and protected by, the exclusive remedy provision of the WDCA.

B

Establishing a labor broker relationship does not, however, necessarily end the analysis. The relationship must still be evaluated under the economic reality test, which in this case yields the same conclusion: Both Miller-Davis and CLS must be considered dual or coemployers for purposes of the exclusive remedy provision of the worker's compensation statute. Again, this standard examines a number of criteria including control, payment of wages, hiring, firing, the maintenance of discipline, and common objective. These factors are viewed together in their entirety under a totality of the circumstances test. We repeat: No one factor is controlling.

First, both employers shared control of the workers. Miller-Davis requested the types of workers it needed to do its bidding at the job site. "[Miller-Davis] will make all directives deemed necessary for the efficient jobsite utilization of leased CLS construction trades personnel through the assigned CLS on-site supervisor (foreman), or the designated CLS official." Miller-Davis never relinquished its ultimate control or

supervision over the work site.[9] This decentralization
of control is not tantamount to a lack of control or
authority on the project. Miller-Davis also furnished
the appropriate tools for the workers to perform their
tasks (unless otherwise provided by union agreement

---

[9] Excerpts from the depositions of CLS employees are illustrative: The
first excerpt is from the deposition of Frank Lombardo, a CLS foreman on
the site where plaintiff Kidder was injured. Benny Korndyke "was the big
boss" from Miller-Davis:

Q. Was there a particular company or person from whom you
received your daily supervision? In other words, who told you what
to do when you got to the job every day?

A. Well the job supervisor was Benny Korndyke.

Q. Korndyke, K-o-r-n-d-y-k-e?

A. Yes.

Q. Would Benny Korndyke have the power and authority to tell
you, hey, we are not going to start until 10:00 o'clock today, some-
thing like that?

A. Oh, yes.

Q. That would be one of his jobs?

A. Right.

Q. If Ben Korndyke saw something that you were doing that he
believed should have been done in a different area or done differ-
ently, could he direct you to direct your people to do it differently?

A. Oh, yes. Yes.

Q. If Ben Korndyke was not happy with one of the people who
was working under you, you have given me these three journeymen
iron workers, could he have told you to remove them from the job?

A. Yes. He could have.

The following excerpts are taken from the depositions of James Lash, a
Miller-Davis superintendent.

Q. What if CLS had too many people on the job, how would that
affect you as a Miller-Davis superintendent?

A. If CLS had too many people on the job, then I have the
authority to dismiss the ones that I don't feel are necessary.

Gerald Lash testified:

Q. Would it be unusual for CLS, the company, to provide tools
for its employees?

A. Yes, it would.

or custom).[10] Miller-Davis controlled the hours on the job, and daily told the workers exactly where they would be working. Miller-Davis did not have to stand over each worker's shoulder, explaining what to do minute to minute or where to put each beam and rivet. "It is not necessary to make fine semantic distinctions as to types of degrees of control, *et cetera.*" *Renfroe* at 266.

Second, the payment of wages indicates that both Miller-Davis and CLS were employers. Miller-Davis reimbursed CLS, dollar for dollar, the actual amount of fringe benefits, withholding and other employment taxes, worker's compensation, and life and health insurance premiums that were incurred by CLS. Again, who writes the check is not dispositive of the employer-employee relationship under *Renfroe* and *Farrell.* The economic reality is that Miller-Davis paid the wages and benefits for each plaintiff through CLS.

The third factor concerns who has the right to hire, fire, and discipline the employees. We find that, under the agreement, this was also a shared responsibility. Miller-Davis hired CLS to provide workers, and although Miller-Davis could not directly hire, fire, or

---

[10] Still other excerpts are illustrative:

*Q.* When you were using the acetylene torch are there other pieces of equipment or clothing or safety things that are required for you to wear?

*A.* Yes.

*Q.* What are those things?

*A.* Goggles and you have to wear a hard hat all the time.

*Q.* Are gloves required?

*A.* No, not necessarily.

*Q.* Is that part of your standard equipment that you bring to a job or is that something you get from the Miller-Davis people?

*A.* Get that from Miller-Davis.

discipline it is undisputed that "CLS agree[d] to remove any person leased to [Miller-Davis] as leased construction trades personnel which [Miller-Davis] deem[ed], at its sole discretion, as unsatisfactory . . . ." Thus it is clear that Miller-Davis could accomplish indirectly that which it could not do directly. Even though the agreement specifies that Miller-Davis could not evaluate CLS employees, Miller-Davis had the right to order CLS to remove unsatisfactory workers.

The fourth criterion traditionally evaluated under the economic-reality test examines the work performed and whether it is part of a common objective, integral to the employer's business. In both cases a common objective or goal was undertaken by both employers. Miller-Davis could not have completed its renovations without employing CLS workers and the CLS workers were working toward completing Miller-Davis' project goals. In fact, in testimony taken during the Wolthuis trial a person stated that there were so many workers on the site and the duties were so intertwined that it could not readily be determined who worked for CLS and who worked for Miller-Davis. Clearly, the two were "so integrally related that their common objectives [were] only realized by a combined business effort." *Farrell* at 277. A labor broker-customer relationship may very well presume a common objective. See *Tolbert v U S Truck Co*, 179 Mich App 471, 476; 446 NW2d 484 (1989) ("[a] labor broker relationship established . . . [a] common objective in a business effort").

Finally, this analysis would not be complete without discussing the meaning of the agreement between CLS and Miller-Davis. We are cognizant that this con-

tract attempts to disavow any employer-employee relationship between the two parties. However, we cannot accept the plaintiffs' characterization of the agreement and refuse to hold that it alone is dispositive of the status of the parties. Just as we have held that control is but one factor to consider under the economic-reality test, so is the contract but one factor. Parties enter into contracts to serve all kinds of purposes in delineating rights, responsibilities, and liabilities, whether for tax, insurance, or other reasons.[11] We hold that the economic reality of these cases is that the rights and responsibilities over these workers were shared by both Miller-Davis and CLS and that the agreement is neither dispositive nor controlling. See *Fitzgerald v Mobil Oil Corp, supra* at 1303; *White v Central Transport, Inc,* 150 Mich App 128; 388 NW2d 274 (1986); *Tolbert v U S Truck Co, supra.*[12] We believe this conclusion best advances the principles embodied within the WDCA.

---

[11] Miller-Davis did not want day-to-day administrative responsibility for paperwork and general employment matters. This is specifically why it hired a labor broker. However, this in no way lessens the fact that control of the work site and project belonged unequivocally to Miller-Davis. Further, the record indicates that the contract was necessary for the protection of the union workers hired by CLS and keeping their business affairs separate from nonunion Miller-Davis employees.

[12] We are cognizant that other jurisdictions may decide differently just how much deference to give the employment agreement. Again, we are persuaded that our view, to treat the agreement as one of many factors, not dispositive in and of itself, best advances the policies and purposes embodied in the worker's compensation act. See *O'Loughlin v Servicemaster Co Ltd Partnership,* 216 Ill App 3d 27; 576 NE2d 196 (1991) (contract is to be considered, but is not necessarily conclusive); *Red Line Express Co v Workmen's Compensation Appeal Bd,* 138 Pa Commw 375, 384; 588 A2d 90 (1991) (lease providing for "exclusive possession and use" is an important factor in determining who is employer, but is not conclusive). But see *Kirby v Union Carbide,* 373 F2d 590, 595 (CA 4, 1967) (the contract is controlling); *Dugas v Pelican Construction Co,* 481 F2d 773, 778 (CA 5, 1973) (the contract is controlling); *Thornton v*

IV

In sum, we find that a labor broker relationship existed between CLS and its customer, Miller-Davis, to an extent that each was a coemployer of the plaintiffs for the purposes of the WDCA. Accordingly, each employer is protected by, and entitled to, the benefit of the exclusive remedy provision of the WDCA. In addition, we further hold that under the economic-reality test, which examines the totality of the circumstances surrounding the employment relationship and work performed, Miller-Davis was the plaintiffs' employer for purposes of the WDCA and thus entitled to enforcement of the exclusive remedy provision.

BRICKLEY, RILEY, and WEAVER, JJ., concurred with MALLETT, C.J.

KELLY, J. I respectfully dissent from the majority's conclusion that defendant was plaintiffs' employer for purposes of the exclusive remedy provision of the Worker's Disability Compensation Act. The contract between defendant and Construction Labor Services states clearly and unequivocally that defendant was not plaintiffs' employer. Therefore, defendant is liable in tort to plaintiffs if shown to be negligent. I would remand this matter to the trial court for further proceedings.

The majority sets forth two separate rationales to support its conclusion that defendant was plaintiffs'

---

*Paktank Florida, Inc,* 409 So 2d 31, 33 (Fla App, 1981)  (the contract is controlling); *Hill v Erdle Perforating Co,* 53 AD2d 1008; 386 NYS2d 265 (1976) (the contract is a factor in creating the jury question with regard to an employer-employee relationship); see *O H Jackson v Weaver,* 516 So 2d 702, 705 (Ala App, 1987)  (the lease agreement is a factor to be considered in assessing the employer-employee relationship).

employer. First, as a labor broker relationship existed between defendant and CLS, defendant became one of plaintiffs' employers. Second, application of the economic realities test reveals that defendant was plaintiffs' employer.

I

With respect to the first holding, I do not agree with the majority's conclusion that coemployer status can be found solely because two parties enter into a labor broker relationship. To support its holding, the majority relies on this Court's decision in *Farrell v Dearborn Mfg Co*,[1] and the Court of Appeals decision in *Renfroe v Higgins Rack Coating & Mfg Co, Inc.*[2] However, in neither case did the courts find that employment status could be determined solely from the fact that a labor broker relationship existed.

In *Renfroe*, Employers Temporary Service (ETS) was in the business of supplying temporary labor to businesses, including to the defendant, Higgins. The plaintiff was a worker supplied by ETS to Higgins. He was injured in a punch press accident. After receiving worker's compensation benefits from ETS, he sued Higgins as a third-party tortfeasor.

The Court of Appeals found that ETS was a labor broker. However, the labor broker relationship was not the basis for the finding that Higgins was the plaintiff's employer. Instead, the Court applied the economic realities test. It concluded that ETS maintained control of its workers by reassigning and paying them daily at its offices. ETS handled all the

[1] 416 Mich 267; 330 NW2d 397 (1982).
[2] 17 Mich App 259, 262; 169 NW2d 326 (1969).

paperwork incident to employment. Higgins maintained control of the workers by directing them to perform various tasks in its factory. It was responsible for paying the workers even though it did so indirectly, through ETS. The Court concluded that both ETS and Higgins were plaintiff's employers, each for different purposes.

Similarly, in *Farrell*, in three out of the four cases consolidated for appeal, a labor broker supplied personnel to various businesses on a temporary basis. This Court did not rely solely on the labor broker relationship to reach its decision. Instead, it applied the economic reality test to determine whether the defendant was the plaintiffs' employer for purposes of the worker's compensation laws.[3] I do not dispute that application of the economic realities test to the typical labor broker situation generates a finding that the labor broker and its customer are both employers. However, I disagree with the majority's conclusion that, in some circumstances, dual employment can be found solely because a labor broker situation exists. In the typical labor broker case, the economic realities test should be applied.

---

[3] Likewise, other jurisdictions have discussed the relationship between labor brokers and worker's compensation laws. Different tests such as the control test and the economic realities test have been used to determine employment status. My research reveals no case that has found immunity under the respective worker's compensation laws solely because of the existence of a labor broker situation. See, e.g., *McMaster v Amoco Foam Products Co*, 735 F Supp 941 (D SD, 1990); *Honey v United Parcel Service*, 879 F Supp 615 (SD Miss, 1995); *Wingate Taylor-Maid Transportation, Inc v Baker*, 310 Ark 731; 840 SW2d 179 (1992); *Pettaway v Mobile Paint Mfg Co, Inc*, 467 So 2d 228 (Ala, 1985); *Whitehead v Safway Steel Products, Inc*, 304 Md 67; 497 A2d 803 (1985); *Danek v Meldrum Mfg & Engineering Co, Inc*, 312 Minn 404; 252 NW2d 255 (1977).

II

Even were the majority correct that sometimes the labor broker relationship alone is dispositive, the factual scenario presented in this case is an excellent example of when it is not. The contract that defendant and CLS signed makes theirs an atypical labor broker relationship. The language renders it so clear and unambiguous that defendant is not plaintiffs' employer, that it alone must control. There is no reason to go on to the economic realities test.

An underlying rationale of the worker's compensation statutes is often cited by this Court. It is that the employer, by agreeing to assume responsibility for all injuries in the course of employment, protects itself from potentially excessive damage awards. Statutory compensation, limited in amount, is substituted for common law negligence liability. *Farrell, supra* at 274-275.

In *Farrell,* we discussed the labor broker situation. In a typical situation, the labor broker is in the business of supplying temporary labor to companies. A company needing labor assistance calls the labor broker and explains the skills that the temporary workers require and the number of workers needed. The labor broker then sends the necessary number of qualified workers to the company. In return, the company pays the labor broker an agreed-upon rate per hour. The labor broker then pays the workers and covers its costs. See *Farrell, Renfroe, supra.* Once the workers arrive at the business, its agent instructs them what to do and how to do it. If the workers do not perform up to expectations, the business can dismiss or discipline them. *Farrell, supra.*

In *Farrell*, we applied the economic realities test to the typical labor broker situation. We held that both the labor broker providing the personnel and the company using the temporary workers' services are employers for purposes of the WDCA. *Id.* at 275-278.

Here, however, we do not have a typical labor broker situation. The contract that defendant and CLS signed has a significant distinguishing feature. It explicitly sets forth the duties of Miller-Davis and CLS. Throughout it, defendant is described as not being the temporary workers' employer. The contract declares that for all purposes CLS is the sole employer. It states in pertinent part:

> 2. MD hereby leases construction trades personnel from CLS pursuant to the job description requests furnished to CLS by MD from time to time. Such leased personnel shall be employees of CLS for all purposes. Such leased personnel shall not be employees of MD for any reason.
>
> 3.(a) For all leased construction trades personnel furnished to MD by CLS, CLS shall be responsible for all employment matters including, but not limited to, withholding of taxes; payment of all withheld taxes and any employment related taxes; providing workers' compensation, disability, life and group health insurance; providing pension plan coverage, if applicable; and providing all other nonobligatory fringe benefits programs. With respect to these obligations on the part of CLS, CLS, at the request of MD, shall submit evidence to MD that such obligations have been met. CLS shall also have the sole responsibility for the payment of all wages to leased personnel furnished to MD.
>
> (b) CLS shall be the employer, and as such, responsible for any and all obligations, including contract administration, with respect to any collective bargaining agreements covering leased construction trades personnel to which CLS is bound.

*     *     *

7.(a) CLS shall be sole responsibility [sic] for recruiting, hiring, training, evaluation, replacement, supervision, discipline, and discharge of individuals furnished to MD by CLS.

(b) CLS shall designate on-site supervisors (foremen) from among its employees to fill positions pursuant to job description requests furnished to CLS by MD. These on-site supervisors (foremen) shall direct operational and administrative matters relating to services provided by CLS leased constructions trades personnel and shall be under the direct supervision of CLS. If CLS does not designate an on-site supervisor (foreman), CLS employees leased to MD shall be responsible and shall report to the CLS official designated by CLS.

(c) Procedures to be followed by CLS employees regarding the time and performance of their duties as leased construction trades personnel to MD shall be determined by the on-site supervisor employed by CLS, or in the absence of an on-site supervisor, the CLS official designated by CLS. MD shall not participate in or be responsible for employment related matters which are normally incident to CLS' employer/employee relationship with leased personnel. MD will make all directives deemed necessary for the efficient jobsite utilization of leased CLS construction trades personnel through the assigned CLS on-site supervisor (foreman), or the designated CLS official. MD shall have no authority or power to modify the terms and conditions of any employment agreement between CLS and its leased personnel, nor shall MD have the right to recruit, hire, train, evaluate, replace, supervise, discipline or discharge individuals leased to MD by CLS. MD's rights with respect to the leased personnel shall be limited to making routine directives to such leased personnel and notifying CLS that specific leased personnel are unsatisfactory to MD.

(d) CLS agrees to remove any person leased to MD as leased construction trades personnel which MD deems, at its sole discretion, as unsatisfactory, and to furnish a suitable replacement for such leased personnel within a reasonable period of time. The provisions of this subparagraph shall not be construed as granting to MD any right to discharge or suspend leased personnel furnished to MD by CLS.

As the contract demonstrates, defendant did everything it could to establish that it was not plaintiffs' employer. CLS had the exclusive right to hire, fire, and discipline the workers. It had the responsibility of controlling the workers at the job site. Defendant absolved itself of all the responsibilities of an employer. The contract expressly states that the temporary workers are employees of CLS and shall not be defendant's employees "for any reason."

The majority refuses to accept defendant's characterization of itself in paragraph two of the agreement, stating that it is not dispositive of the status of the parties. It cites three cases for the proposition that the contract is not controlling: *Fitzgerald v Mobil Oil Corp*, 827 F Supp 1301 (ED Mich, 1993), *Tolbert v U S Truck Co*, 179 Mich App 471; 446 NW2d 484 (1989), and *White v Central Transport, Inc*, 150 Mich App 128; 388 NW2d 274 (1986).

In *Tolbert* and *White,* the Court held that a contract's characterization of the employment arrangement is not controlling. There, both contracts stated that the employees were independent contractors. *Tolbert, supra* at 476; *White, supra* at 129. In *Fitzgerald,* the contract specifically disclaimed the existence of an employer-employee relationship.

It is true that, normally, the parties' characterization of the employment relationship alone should not control. However, where, as here, the contract so thoroughly disclaims an employer-employee relationship, a different situation is presented.

Defendant contracted in the manner it did to avoid an employer's responsibilities, including the purchasing of worker's compensation insurance. If plaintiffs had sought worker's compensation benefits through

defendant, it is evident that defendant would have used its contract with CLS to demonstrate that it was not plaintiffs' employer.

We agree with plaintiffs that defendant cannot be allowed to have its cake and eat it, too. The judicial system should not enable defendant to emerge as a nonemployer when plaintiffs seek worker's compensation benefits, but as their employer when they sue for third-party negligence.

The majority concludes that the policies and purposes of the WDCA are best advanced by treating the contract as just one of many factors, not dispositive in and of itself. See *ante*, p 46, n 12. However, the purpose of the WDCA is to "afford maximum benefit to injured parties." *Nichol v Billot*, 406 Mich 284, 299; 279 NW2d 761 (1979). The employee in this case has already recovered worker's compensation benefits from CLS. Therefore, allowing defendant to successfully assert that it too is plaintiffs' employer in contravention of its clear and unambiguous contract does nothing to further the act's purpose.

Moreover, we recognized in *Farrell* the underlying rationale of the exclusive remedy provision of the WDCA.[4] *It* is to shield the employer from tort liability when the employer agrees to assume automatic liability for all employee injuries. *Farrell, supra* at 274. Here, according to the unambiguous terms of the contract, defendant never agreed to assume worker's compensation responsibility. Therefore, defendant

---

[4] MCL 418.131; MSA 17.231(131).

should not be allowed to assert the exclusive remedy provision as an affirmative defense.[5]

### CONCLUSION

I have difficulty imagining a clearer example than this of a case where neither the labor broker relationship nor the economic realities test should control employment status. Where the terms of a contract are clear and unambiguous, they should be enforced as written. Defendant entered into an agreement that, by its clear and unambiguous terms, denied that defendant was plaintiffs' employer, specifically spelling out that CLS was the sole employer. Under the circumstances, defendant should be bound by the terms of its contract. As it is not plaintiffs' employer, defendant is liable in tort for any negligence to plaintiffs. I would remand these cases to the trial court for further proceedings.

CAVANAGH and BOYLE, JJ., concurred with KELLY, J.

---

[5] As noted by the majority, other jurisdictions, in similar circumstances, have found the contract signed by the parties controlling. See *Dugas v Pelican Construction Co*, 481 F2d 773 (CA 5, 1973); *Kirby v Union Carbide Corp*, 373 F2d 590 (CA 4, 1967).