*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JULIE A. BOLEN,

        Plaintiff-Appellee/Cross-Appellant,

UNPUBLISHED
February 18, 2021

v

MARADA INDUSTRIES, INC., doing business as
COSMA BODY ASSEMBLY MICHIGAN,

        Defendant-Appellant/Cross-Appellee.

No. 348765
Oakland Circuit Court
LC No. 2018-163688-NO

Before: CAVANAGH, P.J., and JANSEN and SHAPIRO, JJ.

PER CURIAM.

Defendant-appellant/cross-appellee, Marada Industries, Inc., doing business as Cosma Body Assembly Michigan, appeals by leave granted[1] the trial court's opinion and order denying its motion for summary disposition under the exclusive remedy provision of the Workers' Disability Compensation Act (WDCA), MCL 481.131(1). On cross-appeal, plaintiff-appellee/cross-appellant, Julie A. Bolen, challenges the grounds on which the trial court denied summary disposition, asserting the statutory language of MCL 481.131(1) precluded defendant having the status of an employer and the availability of the exclusive remedy provision of the WDCA. We reverse and remand.

## I. FACTS AND PROCEDURAL BACKGROUND

This appeal concerns injuries plaintiff sustained while employed as an inspector by ATCO Industries, Inc. (ATCO), and performing her job at defendant's facility. The following background facts are undisputed and taken from the circuit court's opinion:

> [I]n 2016, Defendant secured business with General Motors to manufacture
> rails that were to be incorporated into the Chevrolet Traverse. General Motors had

---

[1] *Bolen v Marada Indus, Inc*, unpublished order of the Court of Appeals, entered August 23, 2019 (Docket No. 348765).

a program that was referred to as the GP-12 process, which applied to new parts that were going to be assembled into its vehicles. The GP-12 process required that parts comply with an "enhanced inspection process" before the parts would be incorporated into General Motors vehicles. According to Dan Kendzior, ATCO's Director of Business Development, when a part manufacturer has to comply with the GP-12 process, it can call on a company in the quality control field to inspect the parts to meet General Motors' requirements. In 2016, ATCO was one of the companies that sought to perform the inspection services that Defendant required. Defendant eventually decided to retain ATCO to perform the services.

On October 20, 2016, ATCO and Defendant entered into a Service Agreement. Beginning in January 201[7], ATCO sent a team of inspectors to Defendant's plant in New Hudson, Michigan. Plaintiff was among the ATCO employees who were assigned to work there. Plaintiff, who had previously worked on other GP-12 inspection jobs, was a Site Leader on the project.

On August 9, 2017, when Plaintiff was working at Defendant's plant, she was struck by bins that were knocked down by a hi-lo forklift that was being operated by one of Defendant's employees. As a result of this, Plaintiff sustained injuries.

Plaintiff filed the instant negligence case against defendant. Defendant moved for summary disposition, asserting plaintiff's assignment by ATCO for employment with defendant meant she was dually employed by ATCO and defendant under a labor broker-customer relationship. Defendant argued that, under the economic reality test, plaintiff was an employee of both entities, and therefore the exclusive remedy provision of the WDCA barred plaintiff's claims and request for damages.

Plaintiff responded that decisions of our Supreme Court interpreting statutes using the definite article "the," similar to the language in the WDCA's exclusive remedy provision, have cast doubt on the viability of the dual-employer doctrine upon which defendant relied to argue it was immune from suit under the exclusive remedy provision. Plaintiff also argued that, even if the dual-employer doctrine applied, summary disposition was inappropriate because ATCO was not a labor broker and that defendant was not her employer on the basis of the economic reality test.

Defendant asserted the trial court was bound to follow Supreme Court precedent and reject plaintiff's argument that the use of the definite article "the" in MCL 418.131(1) rendered the dual-employer doctrine unviable. Defendant challenged plaintiff's argument regarding labor brokers was without merit and the issue was whether defendant could satisfy the four factors of the economic reality test. Further, defendant argued evidence plaintiff relied on in her response actually supported defendant's motion, and that it would be inappropriate to consider plaintiff's unattested, undated, and unsigned affidavit.

Ultimately, the trial court denied defendant's motion for summary disposition. Addressing plaintiff's argument that there could only be one employer under the language of the exclusive remedy provision, the trial court noted plaintiff's reliance on *Robinson v City of Detroit*, 462 Mich

439; 613 NW2d 307 (2000), and her argument that the use of the definite article "the" in the exclusive remedy provision indicated the Legislature's intent to entitle only one employer to immunity from suit under the WDCA. But, the trial court pointed out that plaintiff's argument conflicted with *Farrell v Dearborn Mfg Co*, 416 Mich 267; 330 NW2d 397 (1982), and *Kidder v Miller-Davis Co*, 455 Mich 25; 564 NW2d 872 (1997), which established there could be dual employers in situations involving labor brokers and their customers. Although the trial court agreed with plaintiff that *Farrell* and *Kidder* conflicted with *Robinson*, it explained it was "mandated to follow *Farrell* and *Kidder*." Therefore, the trial court concluded there could be dual employers in this situation.

The trial court also rejected plaintiff's argument that ATCO was not a labor broker, concluding that her argument was without factual support, finding there was a labor broker-customer relationship between ATCO and defendant. However, the trial court noted resolution of that issue was "not the end point of analysis" and explained it "must consider the factors in the economic realities test." The trial court concluded the first factor of the economic reality test (control of the worker's duties) and the fourth factor (performance of duties as an integral part of defendant's business toward the accomplishment of a common goal) favored defendant. The trial court found, however, with reference to the second and third factors of the economic-realities test that there was insufficient evidence "to draw a legal conclusion with regard to the payment of [p]laintiff's wages," and that there was a genuine issue of material fact regarding , the right to hire, fire, and discipline employees. In conclusion, the trial court stated:

> In sum, evidence with respect to the second and third elements of the economic control test are not reasonably susceptible to but a single inference. Rather, there are conflicting inferences that may reasonably be drawn from the evidence presented with respect to those two factors. Accordingly, the Court finds that the issue of employment status should be submitted to a jury. See *Ward v Titan Ins Co*, 287 Mich App 552, 555[; 791 NW2d 488 (2010)], overruled on other grounds by *Admire v Auto Owners Ins Co*, 494 Mich 10[; 831 NW2d 849] (2013) (it is well settled that questions involving employment status are best left to the fact finder).

As a result, the trial court denied defendant's motion for summary disposition. This appeal followed.

## II. DUAL-EMPLOYER DOCTRINE AND LABOR BROKERS

In order to articulate a linear analysis in this case, we first address plaintiff's claims on cross-appeal. Plaintiff first argues that the trial court should have denied summary disposition because the Legislature's use of the definite article "the" in the exclusive-remedy provision of the WDCA renders the dual-employer doctrine unviable and, as a result, defendant could not be an employer of plaintiff. Although we agree with plaintiff's critique, this Court is bound by precedent to conclude otherwise.

This Court reviews a trial court's decision whether to grant or deny a motion for summary disposition is reviewed de novo. *Ingham Co v Mich Co Rd Comm Self-Ins Pool*, 321 Mich App 574, 579; 909 NW2d 533 (2017), remanded on other grounds by 503 Mich 917 (2018).

A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999) (citations and quotation marks omitted).]

"Issues of statutory interpretation are reviewed de novo." *City of Riverview v Sibley Limestone*, 270 Mich App 627, 630; 716 NW2d 615 (2006). This Court's primary goal when performing statutory interpretation is to determine and give effect to the intent of the Legislature. *Bonner v Brighton*, 495 Mich 209, 222; 848 NW2d 380 (2014). "When the words used in a statute or an ordinance are clear and unambiguous, they express the intent of the legislative body and must be enforced as written." *Sau-Tuk Indus, Inc v Allegan Co*, 316 Mich App 122, 137; 892 NW2d 33 (2016). This Court "must assign every word or phrase its plain and ordinary meaning unless the Legislature has provided specific definitions or has used technical terms that have acquired a peculiar and appropriate meaning in the law." *Mayor of Cadillac v Blackburn*, 306 Mich App 512, 516; 857 NW2d 529 (2014). "Each word of a statute is presumed to be used for a purpose, and, as far as possible, effect must be given to every clause and sentence." *Robinson*, 462 Mich at 459.

"[W]hether a particular business entity is a particular worker's 'employer,' as that term is used in the WDCA, is a question of law for the courts to decide if the evidence is reasonably susceptible of but a single inference. Only where evidence of a putative employer's status is disputed, or where conflicting inferences may reasonably be drawn from the known facts, is the issue one for the trier of fact to decide." *Clark v United Technologies Auto, Inc*, 459 Mich 681, 693-694; 594 NW2d 447 (1999) (citations omitted).

MCL 418.131(1) provides, in relevant part: "The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against *the* employer for a personal injury or occupational disease" (emphasis added). In accordance with the rules of statutory construction: "All words and phrases shall be construed and understood according to the common and approved usage of the language[.]" MCL 8.3a. The definite article "the" has a " 'specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article a or an . . . .' " *Robinson*, 462 Mich at 461-462, quoting *Random House Webster's College Dictionary*, p 1382. Thus, under this approach to statutory interpretation, the Legislature's choice of the definite article "the" demonstrates an intent that there is only one employer entitled to immunity from suit under the exclusive remedy provision. *Robinson*, 462 Mich at 458-459. It is a court's "duty . . . to give meaning to the Legislature's choice of one word over the other." *Id*. at 461.

Yet, our Supreme Court has issued decisions in which a determination of "the" employer is neither synonymous with, nor the equivalent of, only one entity, by recognizing that circumstances may exist in which an individual may have more than one employer when evaluating the exclusive-remedy provision of the WDCA. For instance, in *Farrell*, 416 Mich at 267, our Supreme Court held "that the exclusive remedy available to the employee in a labor broker situation is provided by the workers' compensation statute and that a separate tort action against

the customer of the labor broker may not be maintained." *Id*. at 278. Similarly, in *Kidder*, the Court indicated it was "stop[ping] short of holding that a labor broker-customer relationship will always establish dual employer status as a matter of law," indicating the need to consider the factors of the economic reality test. *Kidder*, 455 Mich at 40 n 7. The *Farrell* Court also noted that "[t]o conclude that an individual so employed [by a labor broker] is outside the scope of the exclusive remedy provision would clearly disregard the overall objectives of the statutory scheme." *Farrell*, 416 Mich at 277. Moreover, in *Clark*, our Supreme Court held that more than one corporate entity can rely on the exclusive-remedy provision if the economic realities test favors such a finding. See *Clark*, 459 Mich at 689. ("[T]he dual employer cases involve an essentially horizontal relationship between two business entities who, if so warranted by the application of the economic realities test, can both claim employer status for purposes of the exclusive remedy provision.").

Here, it is undisputed plaintiff was employed by ATCO, which then assigned her to defendant to perform inspections at the time of the accident. Under plaintiff's interpretation, therefore, ATCO would be "the" employer for purposes of MCL 418.131(1), and plaintiff could maintain her suit against defendant. Such an interpretation is consistent with the *Robinson* Court's emphasis on the importance of looking to the language chosen by the Legislature, not the objectives underlying the statute at issue, that must guide statutory interpretation.[2] See *Robinson*, 462 Mich at 459-460 ("This approach can best be described as a judicial theory of legislative befuddlement. Stripped to its essence, it is an endeavor by the Court to use the statute's 'history' to contradict the statute's clear terms."). In fact, *Robinson* stresses that it is this Court's "duty . . . to give meaning to the Legislature's choice of one word over the other." *Id*. at 461.

However, this Court is concurrently bound to follow decisions from the Michigan Supreme Court unless and until those decisions have clearly been overruled or superseded. *Associated Builders & Contractors v Lansing*, 499 Mich 177, 191-192; 880 NW2d 765 (2016). Although *Farrell* and *Kidder* were decided before *Robinson*, and neither contains an analysis of the use of the definite article "the" in the exclusive remedy provision of the WDCA, this Court is bound to follow *Farrell* and *Kidder* unless and until our Supreme Court decides to reconsider the issue. *Id*. As a result, although we agree with plaintiff's position that, under MCL 418.131's plain language, there can only be one employer entitled to the immunity afforded by the exclusive remedy provision, pre-*Robinson* decisions of our Supreme Court require this Court to conclude the dual-employer concept is not obsolete and it would have been impermissible for the trial court to deny defendant's motion for summary disposition on that basis.

Plaintiff also argues the trial court should have denied defendant's motion for summary disposition because ATCO is not a labor broker. However, we disagree.

---

[2] We note that *Robinson* dealt with the grant of governmental immunity in MCL 691.1407(1), and that the exceptions to that immunity are to be narrowly construed. *Robinson*, 462 Mich at 455. On the other hand, " 'the WDCA is a remedial statute that should be liberally construed to grant rather than deny benefits.' " *Belcher v Ford Motor Co*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 348603); slip op at 3-4, quoting *DiBenedetto v West Shore Hosp*, 461 Mich 394, 402; 605 NW2d 300 (2000).

-5-

"Although by its terms the exclusive remedy provision limits the liability of the employee's 'employer,' the provision does not define the term 'employer,' except to note that the term includes certain entities not relevant in this case." *Clark*, 459 Mich at 687 (citation omitted). "That being the case, we have regularly applied the 'economic realities test' to determine whether an employment relationship exists for purposes of the exclusive remedy provision, and thus whether an individual or entity is the 'employer' of a given employee." *Id*. at 687-688 (citations omitted).

> Although the totality of the circumstances are considered, in applying the economic realities test, the courts generally consider the following four factors "(1) [the] control of a worker's duties, (2) the payment of wages, (3) the right to hire and fire and the right to discipline, and (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal." No one factor is controlling. [*Id*. at 688-689 (citations omitted).]

In cases involving more than one potential employer, also known as dual employer or coemployer cases, "the employee typically has a 'legal' or 'actual' employer against whom there is no question that a tort suit is barred . . . and the dispositive question is whether, under the economic realities test, a second entity can also be classified as an employer for purposes of the [exclusive remedy] provision." *Id*. at 689. The dual-employer cases "involve essentially a horizontal relationship between two business entities who, if so warranted by the application of the economic realities test, can both claim employer status for purposes of the exclusive remedy provision." *Id*. at 690 (citation omitted). "[I]n these cases, the separate existence of each entity is respected." *Id*. This category includes cases involving an individual supplied by a labor broker to its customer. *Id*. at 689, citing *Kidder*, 455 Mich at 25.

A labor broker situation involves one company that hires a worker and assigns that worker out to another company. *Farrell*, 416 Mich at 274. Generally, labor brokers are "engaged in the business of supplying personnel on a temporary basis to commercial and industrial companies." *Id*. at 275. "The customers of a labor broker *typically* call in their employment needs on a daily basis, and workers are sent by the broker to fill these needs." *Id*. (emphasis added). Once at the customer's place of business, "the worker is subject to the control and authority of the customer and the customer's supervisory personnel" and the customer can "discharge the employee from the daily work assignment and can refuse to accept a worker sent by the broker." *Id*. Further, "the customer does not pay the employee directly." *Id*. Instead, "the labor broker pays the employee and includes as part of its charge to the customer amounts to cover its expenses for compensation premiums, social security and other taxes." *Id*. at 275-276.

The trial court concluded plaintiff's argument, that ATCO was not a labor broker, was without factual support. The trial court noted that defendant paid ATCO $29.50 per hour for project coordinators (like plaintiff), and ATCO then deducted its profit, taxes, and costs for insurance, before it paid its own employees. The trial court found that the evidence showed defendant could hire or fire ATCO employees, and had control over tasks ATCO employees performed. Moreover, the trial court recognized that, generally, project coordinators obtained directions from defendant, and the coordinators then trained other ATCO employees on the basis of those directions. Further, the trial court found that defendant controlled the safety procedures ATCO employees were required to follow, set work hours for ATCO employees, established rules for ATCO employees' breaks and lunch breaks, and provided ATCO employees with tools for use

on the job. Thus, the trial court concluded defendant "maintained control over the manner in which ATCO staff members performed their duties." The trial court also concluded ATCO's employees were not engaged in a distinct occupation involving a special skill, reasoning that defendant hired additional temporary workers to perform inspections and noting assertions from Michael Mayes, quality manager for defendant, and Kendzior indicating defendant's own employees would have performed the inspections if defendant had a sufficient number of employees to do so.

The trial court did not err in concluding this case involved a labor broker-customer relationship. Plaintiff was hired by ATCO, which then assigned plaintiff to defendant. See *Farrell*, 416 at 274. Once plaintiff arrived at defendant's premises, defendant controlled the safety procedures ATCO employees had to follow, set their work and break hours, and provided them with tools. Additionally, project coordinators, like plaintiff, obtained directions from defendant and then trained other ATCO employees on the basis of those directions. Therefore, as the trial court concluded, defendant maintained control over the manner in which ATCO employees performed their duties. *Id.* at 275. Moreover, evidence demonstrated defendant could discharge plaintiff or any other ATCO employee from his or her work assignment with defendant, and was able to refuse a worker sent by ATCO. *Id.* Further, defenda[]?Lnt did not pay plaintiff directly. Instead, defendant paid ATCO $29.50 per hour for project coordinators (like plaintiff). ATCO then deducted its profit, taxes, and costs for insurance, before it paid its own employees. See *id.* (indicating that in a labor broker situation, the customer does not pay the employee directly and, instead, the broker pays the employee and includes "as part of its charge to the customer amounts to cover" various expenses); see also *Kidder*, 455 Mich at 41-42 ("The fact that [the customer] did not directly pay the workers is a distinction without a different. [The labor broker] was a payment conduit for [the customer]. [The customer] reimbursed [the labor broker] dollar for dollar, including an amount for worker's disability compensation.").

Plaintiff argues that when evaluating whether to apply the exclusive remedy provision of the WDCA, courts must determine whether an entity is a labor broker and, if not, there is no need to consider the economic reality test. We disagree. As defendant points out, the economic reality test is evaluated in all cases involving a second entity seeking the protection of the exclusive remedy provision under MCL 418.131(1). See *Clark*, 459 Mich at 689-690. Moreover, in *Kidder*, our Supreme Court stated that "[e]stablishing a labor broker relationship does not, however, necessarily end the analysis" and that "[t]he relationship must still be evaluated under the economic reality test . . . ." *Kidder*, 455 Mich at 42. Therefore, regardless of whether a labor broker-customer relationship exists, courts must still analyze the economic reality test to determine whether an entity is immune from suit by virtue of the exclusive remedy provision.

## III. ECONOMIC REALITY TEST

Turning now to defendant's direct appeal, defendant first argues the trial court reached "internally inconsistent findings" in its decision to deny defendant's motion for summary disposition, leading to it failing to properly analyze the economic reality test and improperly denying defendant's motion for summary disposition. We agree.

To reiterate:

Although the totality of the circumstances are considered, in applying the economic realities test, the courts generally consider the following four factors "(1) [the] control of a worker's duties, (2) the payment of wages, (3) the right to hire and fire and the right to discipline, and (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal." No one factor is controlling. [*Clark*, 459 Mich at 688-689 (citations omitted).]

The trial court did not err in determining the first factor of the economic reality test, control of a worker's duties, favored defendant. The trial court concluded "the undisputed record evidence" established defendant controlled the duties of ATCO's employees, including plaintiff. In an affidavit, plaintiff asserted that defendant's employees asserted minimal control over the inspections ATCO's employees performed, and that ATCO's employees worked separately from defendant's and were not disturbed by defendant. Further, plaintiff indicated that, in relation to the work she performed, an ATCO employee trained her, and then she was responsible for training the other ATCO employees who went to work at defendant's plant. Plaintiff, however, testified that while she did not have any of defendant's employees working with her on her "line," the second shift "was always short" and "temps would not show up," so defendant's employees would have to step in. Kendzior testified defendant determined which parts the ATCO inspectors would inspect and how they would be inspected. Further, Kendzior stated that defendant determined where the inspectors worked within the plant, controlled safety issues, and was "very involved" in training the ATCO-supplied inspectors. Additionally, defendant provided the inspectors with the necessary tools and daily instructions, including written instructions that could be used as a guide. Kendzior noted that project coordinators, like plaintiff, would typically receive "direction directly from the client, the customer" that the coordinator would then pass on to other ATCO employees. Kendzior also testified that defendant was in a position to tell ATCO employees how to perform their inspections. Additionally, Mayes stated that defendant provided the tools and written instructions necessary for the inspection process, directed inspectors to specific locations to perform the inspections, and if anyone involved in the inspection process, including plaintiff, had questions regarding the process, they would be directed to Mayes or defendant's quality engineers.

Given the totality of the circumstances, the trial court properly concluded this factor favored a finding that defendant was an employer of plaintiff. Although plaintiff stated defendant's employees had "limited" involvement in the inspection process and left ATCO employees "to do their work without inference," that does not conflict with the other evidence regarding defendant's involvement in the inspection process. Plaintiff's statement suggests that once ATCO employees began inspecting parts, they were generally left alone by defendant's employees. But that does not take away from the fact that defendant initially trained the project coordinators in how to inspect the parts, provided daily instructions, or could tell ATCO employees how to perform the inspections. As a result, the trial court did not err in concluding that the first factor of the economic reality test favored a finding that defendant was an employer of plaintiff.

However, the trial court did erroneously conclude there was a "lack[] of sufficient evidence to draw a legal conclusion" regarding the second factor of the economic reality test, the payment of wages. The trial court concluded that while it was "undisputed that ATCO paid Plaintiff's wages," it recognized defendant's argument that plaintiff's "wages essentially came from" defendant because defendant paid ATCO for plaintiff's services. Noting the conflicting nature of

*Kidder*, 455 Mich at 41, and *Clark*, 459 Mich at 695-696, with respect to which entity paid the respective plaintiff's wages, the trial court found that it was "unclear which company was actually responsible for" paying plaintiff's wages. As a result, the trial court concluded it "lack[ed] sufficient evidence to draw a legal conclusion with regard to the payment of Plaintiff's wages."

While it is true that ATCO paid plaintiff ($14.45 per hour), it was undisputed that defendant paid ATCO $29.50 for every hour plaintiff worked for defendant during the inspection process. Thus, had defendant not paid ATCO the $29.50 per hour that plaintiff worked, plaintiff would not have received her wages from ATCO. Additionally, Kendzior testified that from that $29.50, ATCO deducted money for insurance and taxes before paying its employees. Like in *Kidder*, the fact defendant did not directly pay plaintiff or the other inspectors "is a distinction without a difference" because ATCO, like the labor broker in *Kidder*, "was a payment conduit" for defendant. Defendant paid ATCO $29.50 per hour for time plaintiff and the other inspectors worked, with $14.45 of that going to plaintiff, and the remaining being deducted for taxes and insurance. Thus, defendant contributed to the payment of plaintiff's wages and, contrary to the trial court's conclusion, this factor favors a finding defendant was an employer of plaintiff.

The trial court also erroneously concluded there was a genuine issue of material fact regarding whether defendant had the right to hire, fire, and discipline plaintiff. The trial court recognized there was evidence ATCO employees could be told they could not work for a day if they did not comply with defendant's safety regulations. Moreover, the trial court recognized that if defendant was dissatisfied with an employee, it could inform ATCO the person was no longer wanted on the premises. But, the trial court also noted plaintiff was undisputedly hired by ATCO and that defendant's right to send an ATCO employee home or bar him or her from defendant's premises was "not necessarily synonymous with firing . . . ." Moreover, the trial court found there was no evidence plaintiff would have been fired by ATCO if defendant no longer wanted her on the premises, or that defendant ever exercised its right to send plaintiff home because of dissatisfaction with her work.

Defendant had the right to decide whether plaintiff could initially work at defendant's plant, determine whether she could continue working there, and had the ability to discipline plaintiff. Plaintiff testified about defendant's ability to remove workers provided by ATCO and other labor brokers if they failed to adhere to defendant's safety regulations, including not having proper safety shoes while inside defendant's plant. Moreover, Mayes stated he had previously notified ATCO he was unsatisfied with an ATCO supervisor working at defendant's plant and indicated defendant "no longer wanted [the supervisor] working [t]here." Mayes further stated this was "the approach [he] would have taken with anyone who ATCO placed" with defendant if defendant was dissatisfied with that individual. Additionally, although Kendzior testified that while defendant could not tell ATCO to fire an individual from their employment with ATCO, defendant was authorized to remove any worker supplied by ATCO from defendant's plant.

Because the ability to remove a worker from the job site is tantamount to the ability to hire, fire, and discipline that worker, the trial court erroneously concluded there was a genuine issue of material fact regarding the third factor. See *Chiles v Machine Shop*, 238 Mich App 462, 467-468; 606 NW2d 398 (1999) (concluding that the third factor of the economic reality test favored a finding that the defendant, who laid off the plaintiff, a "loaned employee," and did not recall him for eight months, was the plaintiff's employer). As defendant notes, both *Kidder* and *Farrell*

demonstrate that the right to refuse to accept a worker and to remove a worker from a temporary assignment favors a conclusion that the third factor favors application of the exclusive remedy provision. In *Farrell*, our Supreme Court concluded that a labor broker's customer is a coemployer of an assigned worker and noted that the customer "has the power to discharge the employee from the daily work assignment and can refuse to accept a worker sent by the broker." *Farrell*, 416 Mich at 275. This analysis, defendant points out, was from the perspective of a work assignment for the customer at issue and was not in terms of the worker's legal employer. Additionally, the *Kidder* Court explained:

> The third factor concerns who has the right to hire, fire, and discipline the employees. We find that, under the agreement, this was also a shared responsibility. Miller-Davis hired CLS to provide workers, and although Miller-Davis could not directly hire, fire, or discipline it is undisputed that "CLS agree[d] to remove any person leased to [Miller-Davis] as leased construction trades personnel which [Miller-Davis] deem[ed], at its sole discretion, as unsatisfactory . . . ." Thus it is clear that Miller-Davis could accomplish indirectly that which it could not do directly. Even though the agreement specifies that Miller-Davis could not evaluate CLS employees, Miller-Davis had the right to order CLS to remove unsatisfactory workers. [*Kidder*, 455 Mich at 45.]

Given the Supreme Court's analysis equating the ability to remove an unsatisfactory worker with the right to hire, fire, and discipline, the third factor favors finding defendant meets the "employer" criteria for purposes of the exclusive-remedy provisions with regard to plaintiff. Further, the fact defendant was unable to determine plaintiff's employment status *with* ATCO is immaterial to the determination of whether defendant was plaintiff's employer during the time plaintiff worked for defendant on defendant's projects.[3]

The trial court properly determined the fourth factor of the economic reality test, the performance of the duties as an integral part of the employer's business toward the accomplishment of a common goal, favored a finding plaintiff was an employee of defendant. The trial court found plaintiff was hired to help inspect parts for defendant, and together, plaintiff and defendant worked toward the "common objective of completing the project for General Motors." As a result, the trial court concluded the fourth factor favored defendant. Although plaintiff recognizes defendant and ATCO worked together to deliver a product that met the requirements imposed by General Motors, she contends ATCO performed "a quality control service that was *not* part of [defendant's] routine business." But defendant could not have completed its job for General Motors without the help of ATCO and its employees to perform the inspections necessary

---

[3] Plaintiff contends several other facts favor a finding defendant was *not* an employer of plaintiff. Notably, plaintiff points out that ATCO employees wore vests and shirts with the ATCO logo on them to distinguish them from defendant's employees, and that in a postaccident investigation report, defendant made several references to plaintiff being ATCO's employee, not defendant's. But, similarly, the fact plaintiff wore attire with her legal employer's name, and that defendant did not consider plaintiff its employee for purposes of filling out an accident report, is not dispositive with regard to the application of the economic reality test.

to pass General Motors's GP-12 process, and ATCO's employees, including plaintiff, worked toward the goal of completing the project for General Motors. See *Kidder*, 455 Mich at 45 ("[The customer] could not have completed its renovations without employing [the labor broker's] workers and the [labor broker's] workers were working toward completing Miller-Davis' project goals."). Therefore, the trial court did not err in concluding the fourth factor favored a finding plaintiff was an employee of defendant.

The economic reality test requires courts to consider the totality of the circumstances, and no one factor of the test is controlling. *Clark*, 459 Mich at 688-689 Even if the trial court was concerned that defendant could not have plaintiff fired from ATCO, related to the third factor, the other factors of the economic reality test favored a finding of a dual-employer situation, and that only one inference could be drawn from the totality of the circumstances. *Clark*, 459 Mich at 693-694. Thus, we conclude that the trial court erred by denying defendant's motion for summary disposition where defendant was a coemployer of plaintiff and, as a result, comes under the protection of the exclusive remedy provision of the WDCA.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen